**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOMINICK BRANDON, on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FINGER LAKES TRAFFIC CONTROL LLC, ARTERA SERVICES, LLC d/b/a DDS COMPANIES, NORTHLINE UTILITIES, LLC, and O'CONNELL ELECTRIC COMPANY, INC.<br><br>Defendants. | Case No.: **3:25-cv-1669 (ECC/ML)**<br><br>**COLLECTIVE AND CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Dominick Brandon ("Plaintiff" or "Brandon"), by and through his attorneys, Faruqi & Faruqi, LLP, and on behalf of himself and others similarly situated, hereby alleges as follows against Defendants Finger Lakes Traffic Control LLC ("Finger Lakes"), Artera Services, LLC d/b/a DDS Companies ("DDS"), Northline Utilities, LLC ("Northline"), and O'Connell Electric Company, Inc. ("O'Connell") (collectively "Defendants"):

## NATURE OF THE CLAIMS

1. Finger Lakes is a company that specializes in providing traffic control services to DDS, Northline, and O'Connell, throughout upstate New York.

2. Specifically, Finger Lakes provides DDS, Northline, and O'Connell with Flaggers, defined *infra* ¶ 46, to ensure safety at DDS, Northline, and O'Connell jobsites located on or near public roadways and sidewalks in upstate New York, including but not limited to jobsites, in Broome, Delaware, and Tompkins counties.

3. Finger Lakes provides DDS, Northline, and O'Connell with traffic control personnel directly; however, they all work together to maintain significant oversight, direction, and control over Flaggers, including Flaggers' working conditions, schedules, payment methods,

1

and hiring and firing practices.

4.      Defendants' status as joint employers are evident from the myriad ways in which they coordinate(d) with one another to direct and control all aspects of Plaintiff's and other similarly situated Flaggers' employment.

5.      Defendants engage in a common, willful, and deliberate policy and practice of consistently compensating Plaintiff and other similarly situated Flaggers at rates that are drastically below the applicable State minimum wage rates and failing to pay a portion of their overtime wages and for all hours worked.

6.      Moreover, Defendants engage in a common, willful, and deliberate policy and practice of failing to pay Plaintiff and other similarly situated Flaggers at the proper prevailing wage rates and supplemental benefits owed for work performed on public streets, roadways, and sidewalks throughout upstate New York.

7.      Furthermore, Defendants require Plaintiff and other similarly situated Flaggers to drive their personal vehicles between jobsites and incur expenses associated with gas, mileage, tolls, and vehicle maintenance; however, Defendants fail to reimburse them for the same.

8.      Additionally, Defendants require Flaggers to purchase clothing and other equipment from them but improperly deduct the costs relating to same from Flaggers' wages.

9.      Finally, Defendants failed to furnish Plaintiff and other similarly situated Flaggers with Notices of Pay Rate or accurate wage statements, as required by law.

10.     To redress these wrongs, Plaintiff brings claims against Defendants under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. ("FLSA") as a collective action, pursuant to 29 U.S.C. § 216(b) and applicable regulations thereunder, on behalf of himself and all other similarly situated persons employed by Defendants at any time during the full statute of limitations period.

11.     Plaintiff's claims are also brought, in part, under the New York Labor Law, N.Y. Lab. Law §§ 1, *et seq*. ("NYLL") and applicable regulations thereunder, as a class action, pursuant to Federal Rule of Civil Procedure ("FRCP") 23, on behalf of himself and all other similarly situated Flaggers employed by any of the Defendants at any time during the full statute of limitations period.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §§ 1331 and 1343, the Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the FLSA.

13.     The Court also has supplemental jurisdiction over Plaintiff's related claims arising under State law pursuant to 28 U.S.C. § 1367.

14.     Venue is proper under 28 U.S.C. § 1391 because one or more of the Defendants' principal places of business are located in this District and a substantial portion of the events or omissions giving rise to this action occurred in this District.

## PARTIES

**A.      Plaintiff Dominick Brandon**

15.     Brandon is a resident of the State of New York.

16.     Defendants employed Brandon as a Flagger from in or around August 2022 through in or around June 2023.

17.     At all relevant times, Defendants were Brandon's "employers" within the meaning of all applicable statutes and regulations.

**B.      Defendant Finger Lakes Traffic Control LLC**

18.     Finger Lakes is a domestic limited liability company with its principal place of business located at 360 East 14th Street, Elmira Heights, NY 14903.

19.     At all relevant times, Finger Lakes controlled and directed the terms of employment and compensation of Plaintiff, and all others similarly situated.

20.     At all relevant times, Finger Lakes established, implemented, disseminated, and controlled the employment policies applicable to Plaintiff and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiff and all others similarly situated.

21.     At all relevant times, Finger Lakes maintained and exercised its power to hire, fire, promote, and discipline Plaintiff and all others similarly situated.

22.     At all relevant times, Finger Lakes was an "employer" within the meaning of all applicable statutes and regulations.

23.     At all relevant times, Finger Lakes was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA, NYLL, and the regulations thereunder.

24.     Upon information and belief, at all relevant times Finger Lakes had an annual gross volume of sales in excess of $500,000.00.

C.     **Defendant Artera Services, LLC d/b/a DDS Companies**

25.     DDS is a foreign limited liability company with its principal place of business located at 3100 Interstate North Circle Southeast, Suite 300, Atlanta, GA 30339.

26.     At all relevant times, DDS controlled and directed the terms of employment and compensation of Plaintiff, and all others similarly situated.

27.     At all relevant times, DDS established, implemented, disseminated, and controlled the employment policies applicable to Plaintiff and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiff and all others similarly situated.

4

28. At all relevant times, DDS maintained and exercised its power to hire, fire, promote, and discipline Plaintiff and all others similarly situated.

29. At all relevant times, DDS was an "employer" within the meaning of all applicable statutes and regulations.

30. At all relevant times, DDS was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA, NYLL, and the regulations thereunder.

31. Upon information and belief, at all relevant times DDS had an annual gross volume of sales in excess of $500,000.00.

**D.** **Defendant Northline Utilities, LLC**

32. Northline is a domestic limited liability company with its principal place of business located at 15 School Lane, P.O. Box 656, Au Sable Forks, NY 12912.

33. At all relevant times, Northline controlled and directed the terms of employment and compensation of Plaintiff, and all others similarly situated.

34. At all relevant times, Northline established, implemented, disseminated, and controlled the employment policies applicable to Plaintiff and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiff and all others similarly situated.

35. At all relevant times, Northline maintained and exercised its power to hire, fire, promote, and discipline Plaintiff and all others similarly situated.

36. At all relevant times, Northline was an "employer" within the meaning of all applicable statutes and regulations.

37. At all relevant times, Northline was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA, NYLL, and the regulations thereunder.

38.     Upon information and belief, at all relevant times Northline had an annual gross volume of sales in excess of $500,000.00.

**E.     Defendant O'Connell Electric Company, Inc.**

39.     O'Connell is a domestic business corporation with its principal place of business located at 830 Phillips Road, Victor, NY 14564.

40.     At all relevant times, O'Connell controlled and directed the terms of employment and compensation of Plaintiff, and all others similarly situated.

41.     At all relevant times, O'Connell established, implemented, disseminated, and controlled the employment policies applicable to Plaintiff and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiff and all others similarly situated.

42.     At all relevant times, O'Connell maintained and exercised its power to hire, fire, promote, and discipline Plaintiff and all others similarly situated.

43.     At all relevant times, O'Connell was an "employer" within the meaning of all applicable statutes and regulations.

44.     At all relevant times, O'Connell was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA, NYLL, and the regulations thereunder.

45.     Upon information and belief, at all relevant times O'Connell had an annual gross volume of sales in excess of $500,000.00.

## FACTS

**A.     Background**

46.     Finger Lakes is located in Elmira Heights, NY, and upon information and belief, entered into agreements with DDS, Northline, and O'Connell pursuant to which Finger Lakes provides them with personnel who perform a variety of flagging and traffic control services

6

("Flaggers") on DDS, Northline, and O'Connell jobsites located on public roadways (including interstate roadways) throughout upstate New York, including but not limited to, jobsites in Broome, Delaware, and Tompkins counties.

47. Defendants jointly maintain significant oversight, direction, and control over the day-to-day operations of the Flaggers, including Flaggers' working conditions, schedules, payment methods, and hiring and firing practices.

48. Upon information and belief, the work Flaggers perform, at Defendants' direction and under Defendants' control, is pursuant to agreements Finger Lakes have with DDS, Northline, and/or O'Connell, and/or contracts between DDS, Northline, and/or O'Connell and the State of New York and/or other municipalities located in upstate New York.

49. Upon information and belief, the work Flaggers perform, at Defendants' direction and under Defendants' control, is also pursuant to permits issued by the New York State Department of Transportation ("NYSDOT"), and/or other municipalities located in upstate New York, to O'Connell, Northline, and/or DDS.

50. Upon information and belief, the agreements, contracts, and/or permits between the State of New York and DDS, Northline, and/or O'Connell require their direct and indirect subcontractors to pay prevailing wages and comply with all applicable laws.

51. All allegations regarding Plaintiff's and Flaggers' work, pay, and the control exerted over them by Defendants, apply equally to both Plaintiff and the Flaggers who Plaintiff seeks to represent.

52. Flaggers' job duties include, *inter alia*, redirecting traffic away from and cordoning off access to jobsites operated by DDS, Northline, and O'Connell.

53.     Defendants require Flaggers to stay at jobsites operated by DDS, Northline, and O'Connell for indefinite periods of time and at fixed locations.

54.     Indeed, the date, time, duration, and location of Flaggers' shifts are determined exclusively by DDS, Northline, and O'Connell.

55.     Depending on the location and duration of the work to be performed at a particular jobsite, DDS, Northline, and O'Connell determine the number of Flaggers they require to work, as well as the date, time, and duration of the work.

56.     Defendants require every Flagger to take a flagging training course and to pass a written and a practical examination prior to the Flagger's hire.

57.     Upon hiring Flaggers, Finger Lakes, on behalf of DDS, Northline, and O'Connell, directs them to, *inter alia*, purchase clothing and other equipment from Finger Lakes, the cost of which is deducted from Flaggers' wages.

58.     Throughout the relevant time period, Defendants employed at least 1000 Flaggers.

59.      In total, Flaggers typically worked five days per work, for a total of at least 53.75 hours each week.

60.     Flaggers' pay periods span one week, from Monday through Sunday, and Defendants established every Friday as Flaggers' regularly scheduled pay day.

**B.     Joint Employment and Control Over Flaggers' Work**

    **i.     Direction and Control Over Shift Schedules**

61.     Finger Lakes, DDS, Northline, and O'Connell jointly employ Flaggers, and they work in concert to control all aspects of Flaggers' employment.

62.     Finger Lakes, DDS, Northline, and O'Connell typically schedule Flaggers to work from Monday through Friday, from 5:45 a.m. to between 4:00 p.m. and 5:00 p.m., for an average of at least 53.75 hours per work (5:45 a.m. to 4:30 p.m.).

8

63. While Flaggers are routinely scheduled to work at least 53.75 hours per week, Finger Lakes, DDS, Northline, and O'Connell have a common policy of refusing to pay any wages at all for at least 13.75 hours they worked each week.

64. Each morning, Finger Lakes, DDS, O'Connell, or Northline direct Flaggers to report to one of DDS, O'Connell or Northline's facilities known as "yards," at 5:45 a.m. to receive the location of their first assigned jobsite and pick up equipment including, *inter alia*, traffic cones.

65. Finger Lakes, DDS, Northline, and O'Connell occasionally issue Flaggers company vehicles to drive to jobsites throughout the day.

66. If Finger Lakes, DDS, Northline, or O'Connell issue a company vehicle, they require Flaggers to perform a "pre-post inspection" before driving to their first assigned jobsite, during which Flaggers utilize a checklist to inspect the vehicle to ensure it is in working condition.

67. Thereafter, Finger Lakes, DDS, Northline, and O'Connell instruct Flaggers to wait in their personal or company-issued vehicle until 6:00 a.m. when they then direct Flaggers to travel to their first assigned jobsite.

68. Indeed, Defendants instruct Flaggers to input 7:00 a.m. as the time their shifts start; even though, Defendants require Flaggers to arrive at the yard and begin working at 5:45 a.m.

69. Defendants require Flaggers to be ready to report to one of NYSEG's jobsites at all times with proper attire and safety equipment.

70. Flaggers' shifts only conclude when one of Defendants' supervisors informs them that their shift is completed.

71. When instructing Flaggers that their shifts have ended, Defendants direct Flaggers to whom Defendants issued a company vehicle to return the vehicle to the yard and complete paperwork detailing, *inter alia*, the vehicle's mileage, locations visited, and amount of gas used.

72.    Furthermore, in the event DDS, Northline, or O'Connell complete work at a jobsite early, a DDS, Northline, or O'Connell supervisor will direct Flaggers to a second jobsite – and a third or fourth jobsite – so they can continue working until their shift is complete.

73.    Moreover, Defendants instruct Flaggers to input 3:30 p.m. as the time their shifts end, even though Flaggers routinely work or are driving company vehicles and then performing additional work until at least 4:00 p.m. or 5:00 p.m.

### ii.    Direction and Control Over the Manner of Flaggers' Work

74.    Finger Lakes also maintain direction, control, and supervision of the work of Flaggers they employ.

75.    Finger Lakes, DDS, Northline, and O'Connell also maintain direction, control, and supervision of the work of Flaggers they employ.

76.    For example, upon arrival at one of DDS's, Northline's, or O'Connell's yards, Defendants instruct Flaggers to report to a company supervisor (who is also physically present at the yard and on the jobsite), who then assign Flaggers to a jobsite.

77.    Flaggers are notified of the location of the jobsite to which they are assigned via text message.

78.    While at the jobsite, one of Defendants' supervisors direct Flaggers' work, including, *inter alia*, where to stand to direct traffic, where to erect signage, which streets to close, and when to notify their crew of incoming traffic.

79.    Finger Lakes supervisors also perform rounds at the jobsites to, *inter alia*, monitor Flaggers' work, ensure they are dressed appropriately, and using proper traffic safety equipment.

80.    Defendants direct Flaggers to get permission from DDS, Northline, and O'Connell supervisors to take breaks during their shifts.

81. For example, if a Flagger needs to use a restroom or eat lunch, they must get permission from DDS, Northline, and O'Connell supervisors before doing so.

82. Indeed, Defendants direct Flaggers to remain at the jobsite before taking any kind of break until DDS, Northline, or O'Connell supervisors approve the break, either verbally or by directing another Flagger to take over their work.

83. In the event DDS, O'Connell, or Northline supervisors are unable to approve the break, Flaggers are prohibited from leaving the jobsite and will be forced to relieve themselves on the side of a roadway and/or skip eating their lunch.

84. Upon information and belief, Finger Lakes, on behalf of DDS, Northline, and O'Connell, communicates these policies to Flaggers when they are hired and/or during the onboarding process.

85. A Flagger's shift does not conclude until a DDS, Northline, or O'Connell supervisor notifies them that their shift has ended.

86. The fact that Defendants' representatives are on the jobsites, monitoring and directing Flaggers regarding myriad aspects of their work, speaks to the inextricably interconnected manner in which Defendants jointly control Flaggers.

87. Finger Lakes, DDS, O'Connell, and Northline supervisors provide Flaggers with timesheets spanning Monday through Sunday on which they are required to indicate 7:00 a.m. as the start time and 3:30 p.m. as the end time for their shifts each day (***excluding*** off-the-clock work).

88. The timesheets contain, *inter alia*, the Flagger's name, the day worked, and the number of hours the Flagger worked each day, excluding pre- and post-shift off-the-clock work.

89. At the end of each day, Defendants direct Flaggers to calculate the number of hours they worked that day (excluding off-the-clock work) and present the timesheet to a DDS,

11

Northline, or O'Connell supervisor for their signature to verify the number of hours Flaggers worked, excluding off-the-clock work which was never compensated.

90. At the end of each week, Defendants also instruct Flaggers to take a photograph of their timesheets and send them to Finger Lakes via email or text message.

### iii. Hiring, Firing, and Disciplining of Flaggers

91. Defendants also all have the power to hire, fire, and discipline Flaggers for breaching their internal policies and standards.

92. For example, Flaggers are interviewed and hired by Finger Lakes to work for them, DDS, Northline, and O'Connell.

93. Indeed, as part of the onboarding and hiring process, Finger Lakes, on behalf of DDS, Northline, and O'Connell, interviews Flaggers and requires them to fill out an application.

94. Defendants also require every Flagger to take a flagging training course, and to pass a written and a practical examination prior to the Flagger's hire.

95. If a Flagger is hired, Finger Lakes then (on behalf of DDS, Northline, and O'Connell), *inter alia*: (i) instructs the Flagger to fill out paperwork with their personal information, including the Flagger's bank account information for payroll purposes; (ii) makes photocopies of the Flagger's driver's license and social security card; and (iii) directs the Flagger (on behalf of DDS, Northline, and O'Connell) to purchase clothing or other equipment from Finger Lakes, the costs of which are deducted from Flaggers' wages.

96. Additionally, if a Flagger does not report to work without notifying Defendants, leaves a jobsite without permission, or is not dressed and/or equipped properly, one of Defendants' supervisors can discipline the Flagger by, *inter alia*, removing the Flagger from the shift or terminating the Flagger's employment.

97. Furthermore, DDS, Northline, and O'Connell supervisors can also mandate that specific Flaggers work or not work a shift or at a jobsite based on the supervisor's prior dealing with the Flagger.

### iv. Control Over Flaggers' Wages

98. Finger Lakes, DDS, Northline, and O'Connell direct and control the manner in which the Flaggers are paid.

99. Upon information and belief, Defendants jointly establish hourly rates and pay periods for Flaggers.

100. For example, Defendants together set an hourly rate of $18.00 per hour for Flaggers with their overtime rate set at $27.00 per hour.

101. Finger Lakes, DDS, Northline, and O'Connell direct the Flaggers to fill out timesheets to determine the number of hours Flaggers work each week for payroll purposes, excluding off-the-clock work.

102. Upon information and belief, once Defendants determine the number of hours Flaggers work each week (excluding off-the-clock work), DDS, Northline, and O'Connell then pay Finger Lakes an hourly rate for those hours, pursuant to unit prices set in agreements between Finger Lakes and DDS, Northline, or O'Connell.

103. Furthermore, upon information and belief, after receiving payment from DDS, Northline, and O'Connell, Finger Lakes pays Flaggers.

104. In other words, DDS, Northline, and O'Connell pay Flaggers on an hourly basis, through Finger Lakes, for the hours that Flaggers work on their jobsites (excluding off-the-clock hours of work).

105. During the onboarding process, Finger Lakes also gathers Flaggers' banking information so that Finger Lakes, on behalf of DDS, Northline, and O'Connell, can pay Flaggers

via direct deposit, the method of payment by which DDS, Northline, and O'Connell (through Finger Lakes) pay Flaggers.

### v.    Maintenance of Employee Records

106.    Finger Lakes, DDS, Northline, and O'Connell maintain all employment, personnel, and business records for Flaggers.

107.    First, Finger Lakes, on behalf of DDS, Northline, and O'Connell, maintains: (i) Flaggers' job applications; (ii) training course certificates; (iii) Flaggers' written and practical examination results (which Flaggers are required to complete as a condition of employment); (iv) copies of Flaggers' drivers' licenses; (v) copies of Flaggers' car insurance; and (vi) copies of Flaggers' social security cards.

108.    Upon their hire, Finger Lakes, on behalf of DDS, Northline, and O'Connell, directs Flaggers to fill out onboarding paperwork, with their personal information, including, *inter alia*, their banking information for payroll purposes.

109.    Defendants also maintain copies of Flaggers' timesheets, which they use to calculate Flaggers' hours, process Flaggers' payroll, rectify any discrepancies regarding a Flagger's hours worked or wages paid, and control Flaggers' day-to-day employment, rather than merely for quality control procedures.

### vi.    Additional Indicia of Control and Employee Status

110.    Flaggers' relationships with Defendants are permanent insofar as they typically work exclusively for Defendants over extended periods of time.

111.    Defendants jointly require every Flagger to take a flagging training course and pass a written and practical examination prior to a Flagger's hire.

112.    Finger Lakes, on behalf of DDS, Northline, and O'Connell, require Flaggers purchase clothing and other equipment from Finger Lakes as a prerequisite to work on DDS, Northline, and O'Connell jobsites.

113.    However, at all relevant times, DDS, Northline, and O'Connell also provide Flaggers with, and direct them as to when and where to use, other equipment such as barricades and portable traffic signs and cones.

114.    Finger Lakes, DDS, Northline, and O'Connell require Flaggers to wear specific attire and be fully equipped with all required tools and equipment when they arrive at the yards each morning.

115.    Defendants jointly determine Flaggers' rate, method of payment and hours worked.

116.    Defendants jointly maintain control and oversight over the quality of Flaggers' work.

117.    Flaggers do not have the power to, and do not actually, hire or fire anyone.

118.    Flaggers have no ability to set schedules or compensation for any of Defendants' other Flaggers.

119.    Flaggers have no role in budget planning or monitoring, and similarly have no role in implementing legal compliance measures.

120.    Indeed, all such matters are handled by Defendants.

121.    Flaggers have no opportunity for profit or loss, as they are paid the same hourly wage irrespective of the income generated by their work or Defendants' overall profits.

122.    Flaggers perform routine tasks that require little training beyond the training course Defendants require Flaggers to take as a prerequisite for working at DDS, Northline, and O'Connell's jobsites.

123. Flaggers exercise little to no initiative, judgment, or foresight in open market competition with others to ensure their success, as they typically work exclusively for Defendants and for a fixed hourly wage.

124. For example, Flaggers do not independently advertise or market their services.

125. Flaggers do not operate their own businesses independently of Defendants.

126. Upon information and belief, Finger Lakes contracted with DDS, Northline, and O'Connell to provide Flaggers at their jobsites during the relevant period ("Finger Lakes Contract").

127. Because the vast majority of Flaggers' work was performed for and on behalf of DDS, Northline, and O'Connell, Finger Lakes's business operations would be unsustainable without those entities.

128. Flaggers are required on DDS, Northline, and O'Connell jobsites before work can begin.

129. Flaggers' job duties, *i.e.*, ensuring traffic control and work zone safety on DDS, Northline, and O'Connell jobsites are integral to their businesses of maintaining and providing gas and electricity to the millions of people who live in upstate New York.

## C. Time Shaving

130. Throughout the statutory period, Defendants instructed Flaggers to report to one of DDS, Northline and O'Connell's yards at 5:45 a.m. each morning.

131. Upon arrival, Defendants give Flaggers the location of their first assigned jobsite and direct Flaggers to pick up equipment and/or one of Defendants' vehicles to travel to Flaggers' assigned jobsite.

132. At 6:00 a.m., DDS, Northline, and O'Connell instruct Flaggers to leave the yards and travel to the location of the jobsite to which the company assigned the Flagger.

16

133.    However, Defendants always instruct Flaggers to record 7:00 a.m. as the time their shifts begin, even though Defendants direct Flaggers to arrive at their yards and begin working at 5:45 a.m. each day.

134.    Defendants never compensate(d) Flaggers for the time they work before 7:00 a.m., during which Flaggers are: (i) receiving instructions from DDS, Northline, and O'Connell supervisors; (ii) receiving the location of their first assigned jobsite from Defendants; (iii) collecting equipment; (iv) receiving one of Defendants' vehicles which Flaggers are required to inspect before using and departing to their first jobsite; and (v) driving from the yards to one of DDS, Northline, and O'Connell's jobsites to which they are assigned to.

135.    Therefore, all work that is performed before Flaggers' 7:00 a.m. recorded shift start time is always, and improperly, treated as uncompensated off-the-clock work.

136.    Furthermore, Defendants instructs Flaggers to input 3:30 p.m. as the time their shifts end; however, Flaggers routinely work or are driving company vehicles back to the yards until at least 4:00 p.m. or 5:00 p.m.

137.    Also, upon returning Defendants' vehicles, Flaggers are instructed to fill out paperwork detailing, *inter alia*, the vehicle's mileage, locations visited, and amount of gas used.

138.    As a result, Finger Lakes, DDS, Northline, and O'Connell routinely cut at least 11.25 hours[1] of work each week for all Flaggers.

**D.    Failure to Tender Minimum and Overtime Wages and Payment for all Hours Worked**

139.    Defendants engage in a common pattern and practice of deliberately denying Flaggers minimum and overtime wages and payment for all hours worked.

---

[1] 5:45 a.m. to 7:00 a.m. = 1.25 hours; 1.25 hours x five days = 6.25 hours.
3:30 p.m. to 4:30p.m. = 60 minutes. 60 minutes x five days = 5 hours.
6.25 hours + 5 hours = 11.25 hours.

140.    First, Defendants maintain an intentional practice of requiring Flaggers to perform compensable work off-the-clock.

141.    For example, as discussed *supra*, Defendants require Flaggers to begin working at 5:45 a.m. but only pay Flaggers beginning at 7:00 a.m., thereby requiring Flaggers to work at least 75-minutes off-the-clock each morning.

142.    Additionally, Defendants requires Flaggers to input 3:30 p.m. as the time their shifts end, however, Flaggers routinely work or are driving company vehicles back to the yards until at least 4:00 p.m. or 5:00 p.m. and then perform additional work when they return to the yards.

143.    Flaggers are not paid any wages at all for this compensable, pre- and post-shift work.

144.    Defendants' practice results in Flaggers being paid drastically below the applicable State and federal minimum wage rates.

145.    This also results in Defendants denying Flaggers at least 11.25 hours of overtime wages each week that should be paid to Flaggers at a rate of one and one-half times their regular rates of pay.

**E.    Failure to Reimburse for Work-Related Expenses**

146.    When Defendants do not issue Flaggers with a company vehicle to travel in between jobsites, Defendants require Flaggers to use their personal vehicles to do so.

147.    While driving between jobsites, Flaggers incur expenses for gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimburse.

148.    Flaggers' personal vehicles are considered tools of the trade because Defendants require Flaggers to travel in between jobsites as part of their employment and for the performance of Flaggers' work for Defendants.

149. Furthermore, the expenses associated with gas, mileage, tolls, and vehicle maintenance incurred bring Flaggers' wage rates below the applicable State minimum wage (and certainly well below the applicable prevailing wage rates).

150. In lieu of calculating their actual expenses, reimbursement for expenses related to a Flagger's use of their personal vehicles in the performance of their work can be calculated using the Internal Revenue Service's ("IRS") standard mileage rate set by the IRS each year. *See, e.g.*, https://www.irs.gov/tax-professionals/standard-mileage-rates (last visited November 26, 2025).

151. Pursuant to the IRS's standard mileage rates in 2019, 2020, 2021, 2022, 2023, 2024, and 2025, Flaggers who used their personal vehicles to travel between jobsites as required by Defendants should have been paid $0.58, $0.575, $0.56, $0.585-$0.625, $0.655, $0.67, and $0.70 per mile, respectively.

### F. Failure to Pay Prevailing Wages and Supplemental Benefits for Work Performed on New York State Public Roadways and Streets

152. Defendants engage in a common pattern and practice of deliberately denying Flaggers compensation for prevailing wage work at applicable prevailing wage rates.

153. Upon information and belief, Finger Lakes entered into agreements and/or contracts with DDS, Northline, and/or O'Connell, as either a subcontractor or a prime contractor to provide flagging services on New York State public roadways and streets, including but not limited to, jobsites in Broome, Delaware, and Tompkins counties.

154. Defendants are required to pay Flaggers at the local prevailing wage rates, including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, and hours worked during the evening.

155. Furthermore, the work Flaggers perform is predominantly physical in nature and exposes Flaggers to attendant risks shared by other construction workers due to the presence of

19

construction, construction equipment, and public traffic, and was performed in close proximity to construction sites, thereby entitling them to prevailing wages.

156. The work Flaggers perform on New York State public streets and roadways, including but not limited to jobsites in Broome, Delaware, and Tompkins counties, also constitutes "public works" thereby requiring Defendants to pay Flaggers at applicable prevailing wage rates.

157. A project constitutes a public work if: (i) a public agency is a party to the project; (ii) the project is paid for by public funds; and (iii) the primary function or objection of the project is to serve the general public.

158. First, upon information and belief, each jobsite that involves street openings and/or excavation work for DDS, Northline, and O'Connell, requires a permit (the "Permits") issued by NYSDOT.

159. Further upon information and belief, NYSEG entered into Design Bid Build agreements with New York State and/or NYSDOT to obtain the Permits (the "Agreements").

160. Upon information and belief, the Agreements incorporate Appendix A, which mandates that the "Contractor and its subcontractors must pay at least the prevailing wage rate or provide the prevailing supplements, including the premium rates for overtime pay, as determined by the State Labor Department in accordance with the Labor Law…"

161. Additionally, upon information and belief, the Permits includes specific stipulations as to the work being performed, including, *inter alia*, wages to be paid to workers on excavations, including Flaggers.

162. The fact that such Permits (issued by NYSDOT) were required for the work to be performed in New York State obligated Defendants, to ensure that prevailing wages were paid for all work on such projects pursuant to NYLL §§ 220, *et seq.*

20

163. A schedule containing the prevailing wage rates and supplemental benefits Flaggers are to be paid was or should have been annexed to the Finger Lakes Contract, and/or the Agreements.

164. Even if not annexed to the Finger Lakes Contract, and/or the Agreements, the aforementioned schedules are considered expressly or implicitly incorporated into those documents as a matter of law and/or public policy.

165. Further, upon information and belief, the Finger Lakes Contract, the Agreements, and/or the Permits require payment of prevailing wages, either specifically pursuant to NYLL §§ 220, *et seq.* or through a general requirement to comply with all applicable laws, which encompasses NYLL §§ 220, *et seq.*

166. Second, upon information and belief, work performed on DDS, Northline, and O'Connell jobsites is paid for by public funding, including, *inter alia*, government subsidies and/or grants.

167. For example, upon information and belief, New York State and/or NYSDOT awards government subsidies and/or grants to DDS, Northline, and O'Connell that require them to pay workers on their jobsites, including Flaggers, at applicable prevailing wage rates as a condition of receiving subsidies and/or grants.

168. Third, DDS, Northline, and O'Connell provide electric and gas services for millions of people who live in New York State.

169. To that end, the function of the work that Flaggers perform on DDS, Northline, and O'Connell jobsites is to serve and benefit the general public.

170. However, whether a construction project is considered a public or private work is not dispositive since Plaintiff has a statutory right to prevailing wages under both NYLL §§ 220,

*et seq.* and any contractual provisions in the Finger Lakes Contract, and/or the Agreements, mandating compliance with all applicable laws, the forfeiture of which would be against public policy.

171. Further, any promise to pay prevailing wage rates and supplemental benefits in the Permits and/or the Agreements was made for the benefit of Flaggers working on New York State public roadways and sidewalks, which required permits to use or open same.

172. As such, Flaggers are third-party beneficiaries of the Finger Lakes Contract, and/or the Agreements.

173. Therefore, Flaggers who provide flagging and spotting services for DDS, Northline, and O'Connell on New York State public streets and roadways are intended third-party beneficiaries of the Finger Lakes Contract, and/or the Agreements.

174. While the New York State Office of the Comptroller is given authority to enforce NYLL Article 8, Flaggers also have a private right of action under this provision based on their standing as third-party beneficiaries.

175. Upon information and belief, pursuant to the Finger Lakes Contract, and/or the Agreements, and/or Finger Lakes are paid to provide flagging services at jobsites, for which Flaggers must be paid at the applicable prevailing wage rates.

176. Throughout the relevant time period, Flaggers performed flagging work on DDS, Northline, and O'Connell jobsites, including but not limited to, NYSDOT Region 3 and 9 jobsites in Broome, Delaware, and Tompkins counties.

### G.    Failure to Provide Notices of Pay Rate and Accurate Wage Statements

177. The NYLL requires that Defendants provide Flaggers, "at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed

22

as part of the minimum wage, including tip, meal, or lodging allowances . . . ; the regular pay day designated by the employer [ ]; the name of the employer; any 'doing business as' names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary[,]" which is commonly referred to as a Notice of Pay Rate.  NYLL § 195(1)(a).

178.    Throughout the statutory period, Defendants never provided any Flaggers with a Notice of Pay Rate.

179.    The NYLL also requires that Defendants furnish Flaggers with accurate wage statements with each payment of wages.

180.    Throughout the statutory period, Defendants never furnished accurate wage statements to any Flaggers.

181.    As a result of Defendants' failure to provide Flaggers with Notices of Pay Rate and accurate wage statements with each payment of wages, Plaintiff and other Flaggers suffered concrete harm.

182.    Specifically, Plaintiff and other Flaggers have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that Defendants underpaid them; and (iii) advocating for themselves by taking appropriate action to obtain the payments due to them.

183.    Defendants' failure to provide Plaintiff and other Flaggers with Notices of Pay Rate and accurate wage statements not only hindered Plaintiff and other Flaggers from realizing their rights at the time of payment, but also injured Plaintiff and other Flaggers by enabling the actual underpayment of their wages, necessitating this action.

23

**H.    Unlawful Deductions for Equipment**

184.    Defendants also acted willfully and deliberately in maintaining an intentional practice of improperly deducting wages from Flaggers.

185.    Defendants require that Flaggers purchase clothing and other equipment from Finger Lakes for work purposes but deduct the costs of such items from Flaggers' wages until Flaggers have fully reimbursed Finger Lakes for same.

186.    These deductions from Flaggers' wages for having to purchase equipment as required by Defendants and to carry out duties assigned by Defendants, are unlawful.

**I.    Plaintiff Dominick Brandon**

**i.    Background**

187.    In August 2022, Finger Lakes, on behalf of DDS, Northline, and O'Connell, interviewed and hired Brandon.

188.    Brandon worked for Defendants from August 2022 to June 2023.

189.    When Brandon began working for Defendants, they paid him $18.00 per hour, with his overtime rate being $27.00.

190.    From August 2022 through June 2023, Brandon routinely worked Monday through Friday for a total of at least 53.75 hours per week.

191.    During all relevant times, Brandon worked as a Flagger on New York State public streets and roadways in NYSDOT Regions 3 and 9, including jobsites in Broome, Delaware, and Tompkins counties.

192.    During all relevant times, Brandon worked for Defendants on New York State public streets and roadways, including but not limited to, jobsites located at E. Front Street (Hancock), NY-97 (Hancock), Elizabeth Street (Vestal), Vestal Road (Vestal), Main Street (Groton), Welton Street (Harpursville), and Pleasant Grove Road (Ithaca).

24

193. Defendants also instructed Brandon to fill out a job application, take a flagging training course and provide a copy of his training certificate, and pass a written and a practical examination as a condition of his hire.

194. Upon Brandon's hire, Defendants directed Brandon to fill out paperwork with his personal information, including banking information for payroll purposes, and provide a copy of his driver's license, social security card, and car insurance.

195. Finger Lakes, on behalf of DDS, Northline, and O'Connell, also directed Brandon to purchase clothing and other equipment from Finger Lakes, the cost of which was deducted from his wages.

196. Throughout the relevant time period, each morning, Defendants instructed Brandon to report to one of their yards at 5:45 a.m. to receive the location of his first assigned jobsite, to pick up equipment provided by Defendants, such as traffic cones and signs, and on occasion, a company vehicle to travel to jobsites.

197. However, Defendants directed Brandon to input 7:00 a.m. as the time his shifts start, even though he was always required to begin working at 5:45 a.m., thereby requiring Brandon to work 75-minutes off-the-clock each morning.

198. When Defendants did issue Brandon a company vehicle, they required him to perform a "pre-post inspection" on the vehicle before departing the yard, during which he utilized a checklist provided to him by Defendants to ensure the vehicle was in working condition.

199. After receiving his equipment, Brandon conferred with a DDS, Northline, or O'Connell supervisor at the yard regarding the location of his first jobsite, received his company-issued vehicle, performed the mandated vehicle inspection, and was instructed by a DDS, Northline, or O'Connell supervisor to depart to his first jobsite at 6:00 a.m.

200.    When DDS, Northline, and O'Connell crews completed work at a jobsite, a supervisor directed Brandon to report to the location of another jobsite, until his shift concluded.

201.    When Defendants did not issue Brandon a company vehicle, he drove between jobsites using his personal vehicle and incurred expenses for gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimbursed.

202.    At the end of his shift, Defendants required Brandon to drive back to the yards to return the equipment and/or the company vehicle Defendants issued him that morning.

203.    Defendants directed Brandon to input 3:30 p.m. as the time his shifts ended; however, he routinely worked or drove the company vehicle back to the yard until at least 4:00 p.m. or 5:00 p.m.

204.    Upon returning Defendants' vehicles, Brandon was instructed to fill out paperwork detailing, *inter alia*, the vehicle's mileage, locations visited, and amount of gas used.

205.    Brandon's shifts only concluded when a DDS, Northline, and/or O'Connell supervisor informed him that he completed his shift.

206.    While at the jobsite, a DDS, Northline, and/or O'Connell supervisor directed Brandon's work, including, *inter alia*, where to stand to direct traffic, where to erect signage, which streets to close, and when to notify the crew of incoming traffic.

207.    Brandon was required to seek permission and approval from a DDS, Northline, and/or O'Connell supervisor before he could take a bathroom break or eat lunch.

208.    Occasionally, DDS, Northline, and O'Connell supervisors did not approve such breaks and Brandon had to relieve himself on the side of the roadway and skip eating lunch altogether because he was not permitted to leave the jobsite without such approval.

209.    Brandon's pay periods span one week, from Monday through Sunday.

210. Additionally, each week, Finger Lakes, DDS, Northline, and O'Connell issued Brandon with a timesheet spanning Monday through Sunday, and Defendants required Brandon to indicate that his shifts started at 7:00 a.m. each morning (despite that he always began working at 5:45 a.m.) as well as the specified shift end time, usually around 3:30 p.m. (although he always worked for them until at least 4:00 p.m. or 5:00 p.m., and sometimes later).

211. At the end of each day, Defendants directed Brandon to calculate the number of recorded hours he worked that day and present the timesheet to an O'Connell, Northline, and/or DDS supervisor, for their signature to certify the number of hours he worked that day, excluding off-the-clock work, which was never compensated.

212. Brandon's relationship with Defendants was permanent insofar as he worked exclusively for Defendants throughout his employment.

213. Defendants required Brandon to use equipment such as traffic cones and signs provided by Defendants.

214. Defendants dictated Brandon's rates of pay and hours worked.

215. Defendants maintained control and oversight over the quality of Brandon's work.

216. While employed by Defendants, Brandon had no opportunity for profit or loss, as Defendants paid Brandon the same hourly wage irrespective of the income generated by his work or Defendants' overall profits.

217. Brandon performed routine tasks that required little training, besides the flagging training Defendants required Brandon to take as a condition of his employment.

218. Brandon exercised little to no initiative, judgment, or foresight in open market competition with others to ensure his success, as he worked exclusively for Defendants at a fixed hourly wage.

219.    For example, Brandon did not independently advertise or market his services.

220.    Likewise, Brandon did not operate his own business independently of Defendants.

**ii.    Wage Violations**

221.    Despite routinely starting his shift at 5:45 a.m. each day, at all relevant times, Defendants failed to pay Brandon for all of his hours worked as a result of Defendants' common policy and practice of time shaving.

222.    Indeed, Defendants always directed Brandon to input 7:00 a.m. as his start time on timesheets.

223.    In other words, Defendants failed to pay Brandon for the time he worked each morning from 5:45 a.m. to 7:00 a.m.

224.    Further, despite working until at least 4:00 p.m. or 5:00 p.m., Defendants required Brandon to input 3:30 p.m. as his shift end time; thereby, failing to pay him for hours worked after 3:30 p.m. each day.

225.    Defendants failed to pay Brandon for at least 11.25 hours[2] of overtime wages each week that should be paid at a rate of one and one-half times his regular rates of pay.

226.    For example, from October 17, 2022 through October 23, 2022, Brandon worked for Finger Lakes and Northline for approximately 59.25 hours but was only paid $966.87 for 48 hours of work.

227.    For this week alone, Finger Lakes and Northline failed to pay Brandon $303.75 in overtime wages for eleven hours and fifteen minutes (11.25 hours) of off-the clock work.[3]

---

[2] *See* footnote 1.
[3] 59.25 hours – 48 hours = 11.25 hours; 11.25 hours x $27.00 (overtime rate) = $303.75

228. Also, from November 14, 2022 through November 20, 2022, Brandon worked for Fingers Lakes and DDS for approximately 57.75 hours but was only paid $333.70 for 46.50 hours of work.

229. For this week alone, Finger Lakes and DDS failed to pay Brandon $303.75 in overtime wages for eleven hours and fifteen minutes (11.25 hours) of off-the clock work.[4]

230. From April 3, 2023 to April 9, 2023, Brandon worked for Finger Lakes and O'Connell for approximately 51.25 hours, but was only paid $781.04 for 40 hours of work.

231. For this week alone, Finger Lakes and O'Connell failed to pay Brandon $303.75 in overtime wages for eleven hours and fifteen minutes (11.25 hours) of off-the clock work.[5]

232. Additionally, Defendants failed to pay Brandon at the local prevailing wage rates, including supplemental benefits and overtime premiums for hours he worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening.

233. Defendants also required Brandon to purchase clothes and other equipment from Finger Lakes, for work purposes, but deducted the costs for these items from his wages each week until Brandon fully reimbursed Finger Lakes.

234. Further, Defendants failed to furnish Brandon with accurate wage statements.

235. Defendants also failed to issue a Notice of Pay Rate to Brandon at any time during his employment.

236. As a result of Defendants' failure to provide Brandon with a Notice of Pay Rate and accurate wage statements with each payment of his wages, Defendants prevented Brandon

---

[4] 46.50 hours + 11.25 hours = 57.75 hours; 57.75 hours – 46.50 hours = 11.25 hours; 11.25 hours x $27.00 = $303.75
[5] 40 hours + 11.25 hours = 51.25 hours; 51.25 hours – 40 hours = 11.25 hours; 11.25 hours x $27.00 = $303.75.

from, *inter alia*: (i) realizing his true hours worked; (ii) realizing that Defendants underpaid him; and (iii) taking appropriate action to obtain the payments due to him.

237.    Further, Defendants required Brandon to drive his personal vehicle to and from jobsites, which resulted in Brandon incurring costs associated with gas, mileage, tolls, and vehicle maintenance which brought Brandon's wage rates below the applicable State and federal minimum wage rates (and certainly well below the applicable prevailing wage rates)—none of which Defendants reimbursed.

238.    Throughout the duration of his employment, Brandon drove approximately 20 to 200 miles to and from jobsites on days in which Defendants required the same.

239.    Throughout the relevant time period, Brandon had conversations with other Flaggers who confirmed that Defendants denied them compensation for all hours worked, overtime wages, prevailing wages, and never reimbursed them for costs associated with gas, mileage, tolls, and vehicle maintenance.

240.    Like with Brandon, Defendants never issued these Flaggers with accurate wage statements or Notices of Pay Rate.

### FLSA COLLECTIVE ACTION ALLEGATIONS

241.    Plaintiff brings this action, in part, as a collective action under the FLSA and applicable regulations thereunder.

242.    Plaintiff seeks to maintain claims, pursuant to FLSA § 216(b), on behalf of himself and all other Flaggers who Defendants employed at any time during the full statute of limitations period (the "FLSA Collective").

243.    At all relevant times, Plaintiff and the FLSA Collective were similarly situated, had substantially similar job requirements, were paid in the same manner and under the same common

policies, plans, and schemes, and were subject to Defendants' practices of unlawfully reducing compensable off-the-clock working hours, including for straight time and overtime hours worked.

244. Indeed, Plaintiff and the FLSA Collective were subject to Defendants' practices of: (i) failing to compensate them at one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek; and (ii) failing to compensate Plaintiff and the FLSA Collective at the federal minimum wage for all hours worked in a workweek.

245. Throughout the full statute of limitations period, Defendants have been fully aware of the duties performed by Plaintiff and the FLSA Collective, and that those duties were not exempt from the provisions of the FLSA.

246. Defendants' FLSA violations have been willful, repeated, knowing, intentional, and without a good faith basis, and significantly damaged Plaintiff and the FLSA Collective.

247. As a result of Defendants' conduct, they are liable to Plaintiff and the FLSA Collective for the full amount of their unpaid wages with interest, an additional equal amount as liquidated damages, plus the attorneys' fees and costs incurred by Plaintiff and the FLSA Collective.

248. While the exact number of the FLSA Collective is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are approximately 500 other similarly situated Flaggers who were employed by Defendants during the full statute of limitations period.

249. Plaintiff is currently unaware of the identities of the members of the FLSA Collective.

250. Accordingly, Defendants should be required to provide Plaintiff with a list of all Flaggers employed by Defendants during the full statute of limitations period, along with their last

31

known addresses, telephone numbers, and email addresses, so Plaintiff can give the members of the FLSA Collective notice of this action and an opportunity to make an informed decision about whether to participate in it.

## CLASS ACTION ALLEGATIONS

251.    Plaintiff brings his claims, in part, as a class action under the NYLL and applicable regulations thereunder.

### A.    Class Definition

252.    Plaintiff seeks to maintain claims, pursuant to FRCP 23, on behalf of himself and a class of all other similarly situated persons who have been employed by Defendants as Flaggers during the full statute of limitations period (the "Class").

253.    Plaintiff alleges, on behalf of himself and the Class, that Defendants violated the NYLL by, *inter alia*: (i) failing to compensate Plaintiff and the Class at the required minimum wage (ii) failing to compensate Plaintiff and the Class at one and one-half times their regular rate of pay for off the clock hours worked in excess of 40 hours in a workweek; (iii) failing to compensate Plaintiff and the Class for all hours worked at their established regular rates of pay in accordance with their agreed terms of employment; (iv) failing to compensate Plaintiff and the Class at the local prevailing wage rates; (v) failing to reimburse Plaintiff and the Class for business expenses; (vi) making improper deductions from wages owed to Plaintiff and the Class; (vii) failing to provide Plaintiff and the Class with Notices of Pay Rate; and (viii) failing to furnish accurate wage statements to Plaintiff and the Class.

254.    Plaintiff and the Class have standing to seek such relief because of the adverse effects that Defendants' wage practices have had on him individually and as a group.

255.    The wage practices described herein are part of Defendants' normal course of conduct.

**B.    Numerosity and Impracticability of Joinder**

256.    The members of the Class are so numerous that joinder is impracticable.

257.    While the exact number of the members of the Class is unknown to Plaintiff at this time, upon information and belief, there are at least 1000 members of the Class.

258.    Therefore, the numerosity requirement of FRCP 23(a)(1) is satisfied.

**C.    Common Questions of Law and Fact**

259.    Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Class and predominate over any questions only affecting the members of the Class individually.

260.    Indeed, there are few, if any, purely individual issues in this action.

261.    The questions of law and fact that are common to Plaintiff and the Class include, without limitation:

(a)    Whether Defendants failed to pay Plaintiff and the Class all minimum and overtime wages owed to them;

(b)    Whether Defendants failed to pay Plaintiff and the Class for all hours worked;

(c)    Whether Defendants failed to pay Plaintiff and the Class for all hours worked at their regular rates of pay and in accordance with their agreed terms of employment;

(d)    Whether Defendants failed to pay Plaintiff and the Class at the local prevailing wage rates;

(e)    Whether Defendants made improper deductions from wages owed to Plaintiff and the Class;

(f)    Whether Defendants failed to provide Plaintiff and the Class with Notices of Pay Rate;

33

(g)      Whether Defendants failed to furnish accurate wage statements to Plaintiff and the Class; and

(h)      Whether Plaintiff and the Class are entitled to liquidated damages and injunctive relief.

262.    Therefore, the common question requirement of FRCP 23(a)(2) is satisfied.

**D.      Typicality of Claims and Relief Sought**

263.    Plaintiff's claims are typical of the claims of the members of the Class he seeks to represent.

264.    Plaintiff and the Class work or have worked for Defendants, and are or were subject to the same compensation policies and practices.

265.    The wage violations suffered by Plaintiff, and the damages resulting therefrom, are typical of Defendants' treatment of their Flaggers generally, and of the Class specifically.

266.    Therefore, the typicality requirement of FRCP 23(a)(3) is satisfied.

**E.      Adequacy of Representation**

267.    Plaintiff will fairly and adequately protect the interests of the Class because his interests are coextensive and aligned with those of the members of the Class.

268.    Plaintiff has no interests adverse to the Class he seeks to represent.

269.    Plaintiff is willing and able to represent the Class fairly and vigorously, in part because he does not assert any individual claims separate and apart from the Class he seeks to represent.

270.    Plaintiff has retained competent counsel who are qualified and experienced in employment class action litigation and able to meet the demands necessary to litigate a class action of this size and complexity.

34

271.   The combined interests, experience, and resources of Plaintiff and his counsel to competently litigate the individual and Class claims at issue in the instant action satisfy the adequacy of representation requirement of FRCP 23(a)(4).

**F.      Requirements of FRCP 23(b)(1)**

323.   Without certification of the Class, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

324.   Accordingly, certification of the Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff and the Class.

325.   By filing this Complaint, Plaintiff is preserving the rights of the Class with respect to the statute of limitations on their claims.

326.   Therefore, not certifying a class would substantially impair and/or impede the remaining members of the Class's ability to protect their interests.

**G.      Requirements of FRCP 23(b)(2)**

327.   Defendants acted on grounds, described herein, generally applicable to Plaintiff and the Class by denying Plaintiff and the Class all wages owed, overtime wages, making improper wage deductions, and failing to furnish Notices of Pay Rate and accurate wage statements.

328.   These acts are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiff and the Class as a whole.

329.   Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact at issue in this action.

330.   Declaratory and injunctive relief are the factual and legal predicates for Plaintiff's and the Class's entitlement to monetary and non-monetary remedies for such wage violations.

35

331. Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## H.      Requirements of FRCP 23(b)(3)

332. The common issues of fact and law affecting Plaintiff's claims and those of the Class—including, without limitation, the common issues identified in the paragraphs above—predominate over issues affecting only individual claims.

333. A class action is superior to other available methods for the fair and efficient adjudication of Plaintiff's and the Class's claims.

334. The cost of proving Defendants' pattern and practice of denying overtime and other wages makes it impractical for the members of the Class to pursue their claims individually.

272. This class action will not be difficult to manage for reasons including, without limitation, the discrete organizational nature of all members of the Class (they must have worked for Defendants as Flaggers during the statutory period), as well as the common questions of law and fact described herein.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE FLSA: FAILURE TO PAY OVERTIME**
*(On Behalf of Plaintiff and the FLSA Collective)*

273. Plaintiff, on behalf of himself and the FLSA Collective, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

274. During the full statutory period, Plaintiff and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and applicable regulations thereunder.

275. The FLSA requires covered employers, including Defendants, to compensate employees at a rate not less than one and one-half times their regular rate of pay (and not less than one and one-half times the federal minimum wage rate) for all hours worked in excess of 40 hours in a workweek.

276.    Plaintiff and the FLSA Collective were not exempt from the requirement their employer pay them overtime under the FLSA, and they are entitled to be paid overtime by Defendants for all hours worked in excess of 40 hours in a workweek during the full statute of limitations period.

277.    Throughout the full statute of limitations period, Defendants engaged in a policy and practice of failing to compensate Plaintiff and the FLSA Collective at the required overtime rate for time spent working in excess of 40 hours in a workweek.

278.    As a result of Defendants' failure to pay overtime compensation to Plaintiff and the FLSA Collective, Defendants violated the FLSA and/or applicable regulations thereunder.

279.    Defendants acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiff and the FLSA Collective, in accordance with the FLSA and/or applicable regulations thereunder.

280.    Defendants' violations of the FLSA significantly damaged Plaintiff and the FLSA Collective and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE FLSA: FAILURE TO PAY MINIMUM WAGE
### *(On Behalf of Plaintiff and the FLSA Collective)*

281.    Plaintiff, on behalf of himself and the FLSA Collective, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

282.    During the full statutory period, Plaintiff and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and applicable regulations thereunder.

283. The FLSA requires covered employers, including Defendants, to compensate employees at a rate not less than the federal minimum wage for all hours worked in a workweek.

284. Plaintiff and the FLSA Collective were not exempt from the requirement that their employer pay them minimum wages under the FLSA.

285. During the statute of limitations period, Defendants engaged in a policy and practice of failing to compensate Plaintiff and the FLSA Collective at a rate not less than the federal minimum wage for all hours worked in a workweek.

286. As a result of Defendants' failures to compensate Plaintiff and the FLSA Collective at a rate not less than the federal minimum wage for all hours worked in a workweek, Defendants have violated the FLSA and/or applicable regulations thereunder.

287. Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiff and the FLSA Collective in accordance with the FLSA.

288. Defendants' violations of the FLSA have significantly damaged Plaintiff and the FLSA Collective and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PAY OVERTIME**
***(On Behalf of Plaintiff and the Class)***

289. Plaintiff, on behalf of himself and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

290. During the full statutory period, Plaintiff and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 190, *et seq.*, and 650, *et seq.*, and all applicable regulations thereunder.

38

291.    The NYLL requires covered employers, including Defendants, to compensate Flaggers at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek.

292.    Plaintiff and the Class were not exempt from the requirement that Defendants pay them overtime under the NYLL, and they are entitled to be paid overtime by Defendants for all hours worked in excess of 40 hours in a workweek during the full statute of limitations period.

293.    Throughout the full statute of limitations period, Defendants engaged in a policy and practice of failing to compensate Plaintiff and the Class at a rate not less than one and one-half times their regular rate of pay for time spent performing off-the-clock work in excess of 40 hours in a workweek.

294.    As a result of Defendants' failure to pay overtime for time spent performing off-the-clock work in excess of 40 hours in a workweek to Plaintiff and the Class, Defendants violated the NYLL and/or applicable regulations thereunder.

295.    Defendants acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiff and the Class, in accordance with the NYLL.

296.    Defendants' violations of the NYLL significantly damaged Plaintiff and the Class, and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PAY MINIMUM WAGE**
(*On Behalf of Plaintiff and the Class*)

297.    Plaintiff, on behalf of himself and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

39

298.    During the full statutory period, Plaintiff and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 190, *et seq.*, and 650, *et seq.*, and all applicable regulations thereunder.

299.    The NYLL requires covered employers, including Defendants, to compensate Plaintiff and the Class at a rate not less than the applicable State minimum wage for all hours worked under 40 hours in a workweek.

300.    Plaintiff and the Class were not exempt from the requirement that Defendants pay them minimum wages under the NYLL, and they are entitled to be paid minimum wages by Defendants for all hours worked under 40 hours in a workweek during the full statute of limitations period.

301.    Throughout the full statute of limitations period, Defendants engaged in a policy and practice of failing to compensate Plaintiff and the Class at a rate not less than the applicable State minimum wage for all hours worked under 40 hours in a workweek.

302.    As a result of Defendants' failure to compensate Plaintiff and the Class at a rate not less than the applicable State minimum wage for all hours worked under 40 hours in a workweek, Defendants have violated the NYLL and/or applicable regulations thereunder.

303.    Defendants acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiff and the Class in accordance with the NYLL.

304.    Defendants' violations of the NYLL significantly damaged Plaintiff and the Class and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PAY ALL WAGES OWED**
*(On Behalf of Plaintiff and the Class)*

305.    Plaintiff, on behalf of himself and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

306.    During the full statutory period, Plaintiff and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

307.    The NYLL requires covered employers, including Defendants, to compensate Plaintiff and the Class at their established regular rates of pay for all hours worked in a workweek.

308.    Plaintiff and the Class were not exempt from the requirement and are entitled to be paid by Defendants at their established regular rates of pay for all hours worked in a workweek, during the full statute of limitations period.

309.    Throughout the full statute of limitations period, Defendants engaged in a common policy and practice of failing to pay Plaintiff and the Class at their established regular rates of pay for all hours worked.

310.    As a result of Defendants' failure to compensate Plaintiff and the Class at their established regular rates of pay (or one and one-half times their established regular rates) for all hours worked, Defendants violated the NYLL and/or applicable regulations thereunder.

311.    Defendants acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiff and the Class in accordance with the NYLL.

312.    Defendants' violations of the NYLL significantly damaged Plaintiff and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: NOTICES OF PAY RATE**
(*On Behalf of Plaintiff and the Class*)

313.    Plaintiff, on behalf of himself and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

314.    During the full statutory period, Plaintiff and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 190, *et seq.*, and all applicable regulations thereunder.

315.    The NYLL requires covered employers, including Defendants, to provide Flaggers, "at the time of hiring, a notice containing the following information:  the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances . . . ; the regular pay day designated by the employer [ ]; the name of the employer; any 'doing business as' names used by the employer;  the physical address of the employer's main office or principal place of business, and a mailing address if different;  the telephone number of the employer; plus such other information as the commissioner deems material and necessary," which is commonly referred to as a Notice of Pay Rate.  NYLL § 195(1)(a).

316.    Plaintiff and the Class were not exempt from the requirement that Defendants provide them with Notices of Pay Rate.

317.    Throughout the full statute of limitations period, Defendants engaged in a policy and practice of unlawfully failing to provide Notices of Pay Rate to Plaintiff and the Class.

318.    As a result of Defendants' failure to provide Notices of Pay Rate to Plaintiff and the Class, Defendants violated, *inter alia*, NYLL § 195.

319.    Defendants acted willfully and deliberately in maintaining an intentional practice of failing to provide proper notices to Plaintiff and the Class in accordance with the NYLL.

320.    Further, due to Defendants' failure to provide Notices of Pay Rate, Plaintiff and the Class suffered concrete harm.

321.    Specifically, Defendants prevented Plaintiff and the Class from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that Defendants underpaid them; and (iii) advocating for themselves by taking appropriate action to obtain the payments due to them.

322.    Defendants' failure to provide Plaintiff and the Class with Notices of Pay Rate not only hindered Plaintiff and the Class from realizing their rights at the time of payment but also injured them by enabling the underpayment of their wages, necessitating this action.

323.    Defendants' violations of the NYLL significantly damaged Plaintiff and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, $50.00 for each workday the violation occurred, not to exceed $5,000.00, plus attorneys' fees and costs.

### SEVENTH CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: INACCURATE WAGE STATEMENTS
### (*On Behalf of Plaintiff and the Class*)

324.    Plaintiff, on himself of themselves and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

325.    During the full statutory period, Plaintiff and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 190, *et seq.*, and all applicable regulations thereunder.

326.    The NYLL requires covered employers, including Defendants, to "furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages;  name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage . . . ; and net wages."  NYLL § 195(3).

327.    Plaintiff and the Class were not exempt from the requirement that Defendants provide them with accurate wage statements.

328.    Throughout the full statute of limitations period, Defendants engaged in a policy and practice of unlawfully failing to furnish accurate wage statements to Plaintiff and the Class.

329.    As a result of Defendants' failure to furnish accurate wage statements to Plaintiff and the Class, Defendants violated, *inter alia*, NYLL § 195.

330.    Defendants acted willfully and deliberately in maintaining an intentional practice of failing to furnish proper wage statements to Plaintiff and the Class in accordance with the NYLL.

331.    Further, due to Defendants' failure to provide accurate wage statements, Plaintiff and the Class have suffered concrete harm.

332.    Specifically, Defendants prevented Plaintiff and the Class from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that Defendants underpaid them; and (iii) advocating for themselves by taking appropriate action to obtain the payments due to them.

333.    Defendants' failure to provide Plaintiff and the Class with accurate wage statements not only hindered Plaintiff and the Class from realizing their rights at the time of payment but also injured them by enabling the underpayment of their wages, necessitating this action.

334.    Defendants' violations of the NYLL significantly damaged Plaintiff and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, $250.00 for each workday the violation occurred, not to exceed $5,000.00, plus attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: UNREIMBURSED BUSINESS EXPENSES**
(*On Behalf of Plaintiff and the Class*)

335.    Plaintiff, on himself of themselves and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

336.    During the full statutory period, Plaintiff and the Class were protected by the provisions of the NYLL and applicable regulations thereunder, including, *inter alia*, 12 N.Y.C.R.R. § 146-2.7(c).

337.    The NYLL and applicable regulations thereunder protect employees from incurring expenses in the ordinary course of their employment that result in the employee's rate of pay falling below the applicable State minimum wage rate.

338.    Throughout the full statute of limitations period, Defendants required Plaintiff and the Class to drive their personal vehicles in the course of their employment and in the performance of their work.

339.    Plaintiff and the Class incurred expenses associated with gas, mileage, tolls, and vehicle maintenance in the use of their personal vehicles in the course of their employment, as required by Defendants, which brought Plaintiff's and the Class's wages below the applicable State minimum wage rate.

340.    Defendants failed to reimburse Plaintiff and the Class for these expenses.

341.    As a result of Defendants' failure to reimburse Plaintiff and the Class for all business expenses that Defendants required Plaintiff and the Class to incur, Defendants violated, *inter alia*, 12 N.Y.C.R.R. § 146-2.7(c).

342.    Defendants' violations of the NYLL and applicable regulations thereunder significantly damaged Plaintiff and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unreimbursed business

45

expenses, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## NINTH CAUSE OF ACTION
## VIOLATIONS OF THE NYLL: UNLAWFUL DEDUCTIONS
### (On Behalf of Plaintiff and the Class)

343.    Plaintiff, on behalf of himself and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

344.    During the full statutory period, Plaintiff and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

345.    The NYLL and/or applicable regulations thereunder prohibit employers, including Defendants, from making deductions from Plaintiff's and the Class's wages.

346.    Plaintiff and the Class were not exempt from the requirement that their employer not make unlawful deductions from their wages.

347.    By the actions described above, Defendants made unlawful deductions from Plaintiff's and the Class's wages.

348.    As a result of Defendants' unlawful deductions from Plaintiff's and the Class's wages, Defendants violated the NYLL and/or applicable regulations thereunder.

349.    Defendants acted deliberately in maintaining an intentional practice of failing to compensate Plaintiff and the Class in accordance with the NYLL.

350.    As a result of Defendants' violations of the NYLL, Plaintiff and the Class are entitled to recover damages to the greatest extent permitted under the law.

## TENTH CAUSE OF ACTION
## BREACH OF CONTRACT
### (On Behalf of Plaintiff and the Class)

351.    Plaintiff, on himself of himself and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

46

352. As detailed above, upon information and belief, Defendants entered into the Finger Lakes Contract, O'Connell, Northline, and/or DDS entered into the Agreements with or were issued the Permits by New York State to provide flagging services on New York State public streets, roadways, and sidewalks.

353. Upon information and belief, pursuant to the Finger Lakes Contract, Agreements, and/or Permits, Defendants were required to pay Plaintiff and the Class the local prevailing wage rate, including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, and hours worked during the evening.

354. Further, upon information and belief, the Finger Lakes Contract, Agreements, and/or Permits require payment of prevailing wages, either specifically pursuant to NYLL §§ 220, *et seq.* or through a general requirement to comply with all applicable laws, which encompasses NYLL §§ 220, *et seq.*

355. Upon information and belief, the Finger Lakes Contract, and/or Agreements contain schedules of the prevailing rates of wages and supplemental benefits to be paid to Plaintiff and the Class performing such work under the contracts and/or the Permits.

356. The promise to pay prevailing wage rates and supplemental benefits in the Finger Lakes Contract, Agreements, and/or Permits was made for the benefit of Plaintiff and the Class who worked on New York State public streets, roadways, and sidewalks under those contracts and/or the Permits.

357. Defendants failed to pay Plaintiff and the Class prevailing wage rates for straight-time and overtime work and failed to pay supplemental benefits.

358. As detailed above, Defendants breached the Finger Lakes Contract, Agreements, and/or Permits by, *inter alia*, failing to pay Plaintiff and the Class prevailing wage rates for straight

47

time, overtime, and supplemental benefits for work performed under those contracts and/or the Permits.

359.    Defendants' unlawful conduct was intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's and the Class's rights.

360.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

## ELEVENTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### *(On Behalf of Plaintiff and the Class)*

361.    Plaintiff, on behalf of himself and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

362.    As detailed above, upon information and belief, Defendants entered into the Finger Lakes Contract, O'Connell, Northline, and/or DDS entered into the Agreements with or were issued the Permits by New York State to provide flagging services on New York State public streets, roadways, and sidewalks.

363.    Upon information and belief, pursuant to the Finger Lakes Contract, Agreements, and/or Permits, Defendants were required to pay Plaintiff and the Class the local prevailing wage rate, including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, and hours worked during the evening.

364.    Further, upon information and belief, the Finger Lakes Contract, Agreements, and/or Permits require payment of prevailing wages, either specifically pursuant to NYLL §§ 220, *et seq.* or through a general requirement to comply with all applicable laws, which encompasses NYLL §§ 220, *et seq.*

48

365.    Upon information and belief, the Finger Lakes Contract, and/or Agreements contain schedules of the prevailing rates of wages and supplemental benefits to be paid to Plaintiff and the Class performing such work under the contracts and/or the Permits.

366.    The promise to pay prevailing wage rates and supplemental benefits in the Finger Lakes Contract, Agreements, and/or Permits was made for the benefit of Plaintiff and the Class who worked on New York State public streets, roadways, and sidewalks under those contracts and/or the Permits.

367.    Defendants failed to pay Plaintiff and the Class prevailing wage rates for straight-time and overtime work and failed to pay supplemental benefits.

368.    As detailed above, Defendants breached the Finger Lakes Contract, Agreements, and/or the Permits by, *inter alia*, failing to pay Plaintiff and the Class prevailing wage rates for straight time, overtime, and supplemental benefits for work performed under those contracts and/or the Permits.

369.    As a direct and proximate result of Defendants' conduct, Defendants retained the benefit of Plaintiff's and the Class's work under circumstances which render it inequitable and unjust for Defendants to retain such benefits without paying for their value.

370.    Defendants' unlawful conduct was intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's and the Class's rights.

371.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, the Class, and the FLSA Collective

respectfully requests that this Court:

A.    Declare that the practices complained of herein are unlawful under applicable federal and State law;

B.    Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. § 216, and direct Defendants to provide Plaintiff with a list of all members of the FLSA Collective, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiff can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

D.    Declare this action to be maintainable as a class action pursuant to FRCP 23, and direct Defendants to provide Plaintiff with a list of all members of the Class, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiff can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

E.    Designate Plaintiff as the representative of the FLSA Collective, and his counsel of record, Faruqi & Faruqi, LLP, as counsel for the FLSA Collective;

F.    Designate Plaintiff as the representative of the Class, and his counsel of record, Faruqi & Faruqi, LLP, as class counsel;

G.    Determine the damages sustained by Plaintiff and the FLSA Collective as a result of Defendants' violations of the FLSA, and award those damages against Defendants and in favor of Plaintiff and the FLSA Collective, plus such pre- and post-judgment interest as may be allowed by law;

H.      Determine the damages sustained by Plaintiff and the Class as a result of Defendants' violations of the NYLL, and award those damages against Defendants and in favor of Plaintiff and the Class, plus such pre- and post-judgment interest as may be allowed by law;

I.      Award Plaintiff, the FLSA Collective, and the Class an additional equal amount as liquidated damages;

J.      Award Plaintiff, the FLSA Collective, and/or the Class their reasonable attorneys' fees and costs and disbursements in this action including, without limitation, any accountants' or experts' fees; and

K.      Grant such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself, the FLSA Collective, and the Class, hereby demands a trial by jury on all issues of fact and damages.

Dated:  November 26, 2025                    **FARUQI & FARUQI, LLP**
        New York, NY

                                            By: */s/ Innessa M. Huot*
                                                Innessa M. Huot

                                            685 Third Avenue, 26th Floor
                                            New York, New York 10017
                                            Tel: 212-983-9330
                                            Fax: 212-983-9331
                                            ihuot@faruqilaw.com

                                            *Attorneys for Plaintiff, the*
                                            *Proposed FLSA Collective, and*
                                            *the Proposed Class*

51

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOMINICK BRANDON, on behalf of himself and others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FINGER LAKES TRAFFIC CONTROL LLC, ARTERA SERVICES, LLC d/b/a DDS COMPANIES, NORTHLINE UTILITIES, LLC, and O'CONNELL ELECTRIC COMPANY, INC. <br><br> Defendants. | Case No.:  3:25-cv-1669 (ECC/ML) <br><br><br> **CONSENT TO SUE** |

I, Dominick Brandon, was employed by Defendants within the last three years and am a named Plaintiff in the above-captioned action, *Brandon, et al. v. Finger Lakes Traffic Control LLC, et. al.,* pending in the United States Court for the Northern District of New York.  I hereby consent to sue Defendants and be a party Plaintiff in this lawsuit.

I hereby appoint the law firm of Faruqi & Faruqi, LLP, located at 685 Third Avenue, 26th Floor, New York, NY 10017, telephone number (212) 983-9330, as my attorneys.


Name (Print): Dominick Brandon


Signature: Dominick Brandon (Nov 25, 2025 17:25:46 EST)      Date: 11/25/2025